2003-NMCA-111

76 P.3d 644

**STATE of New Mexico, Plaintiff–Appellee,**

v.

**Jesus "Chuy" ABRIL, Defendant– Appellant.**

**No. 22,730.**

Court of Appeals of New Mexico.

July 23, 2003.

Certiorari Denied, No. 28,227, Sept. 9, 2003.

Patricia A. Madrid, Attorney General, Santa Fe, NM, Jacqueline R. Medina, Assistant Attorney General, Albuquerque, NM, for Appellee.

John B. Bigelow, Chief Public Defender, Laurel A. Knowles, Assistant Appellate Defender, Santa Fe, NM, for Appellant.

## OPINION

ALARID, Judge.

{1} Defendant, Jesus Abril, appeals from a judgment convicting him of one count of child abuse, sentencing him to eighteen-years imprisonment, and designating his crime as a serious violent offense. We affirm.

## BACKGROUND

{2} On November 4, 2000, Defendant and his girlfriend, Arlene Bonner (Bonner), took their one-year-old son Isaac Abril (Isaac), to the emergency room at Gila Regional Medical Center. Isaac was in a life-threatening state of dehydration. X-rays and a CT scan showed multiple rib fractures. Isaac's injuries made breathing and swallowing painful. Six ribs had been fractured previously and were healing. Five ribs showed fresh fractures. There was uniform agreement among the physicians who treated Isaac that the fractures had occurred on at least two, possibly three, separate occasions.

{3} Medical personnel alerted authorities to the possibility that Isaac had been abused. Isaac recovered from his injuries and was placed in the custody of the Children, Youth and Families Department. Defendant was charged in a criminal information with one count of abuse of a child resulting in great bodily harm. NMSA 1978, § 30–6–1(D) (2001).

{4} At trial, Defendant admitted that he played rough with Isaac, but denied intentionally harming him. Defendant suggested that Isaac's injuries might have occurred in a car accident in late June 2000, or as the result of an older child falling on Isaac at a party in October 2000.

{5} The State introduced undisputed expert medical testimony that due to the flexibility of a young child's ribs, it would have taken extraordinary force to fracture Isaac's ribs. The physician who admitted Isaac to the hospital testified that, in his opinion, Isaac's injuries were caused intentionally, either by being struck while being held firmly or by being squeezed with force sufficient to snap his ribs. The physician rejected the defense's theory that Isaac's injuries had occurred during rough play with Defendant or other children. In anticipation of Defendant's claim that Isaac had been injured in an automobile accident, the State called the paramedic who had examined Isaac at the scene of the June 2000 accident. According to the paramedic, he had palpitated Isaac "from head to toe" and Isaac had not flinched when he palpitated his ribs, leading the paramedic to conclude that Isaac's ribs had not been broken. The State called the older child who Defendant claimed had fallen on Isaac. The older child denied having ever fallen on him. Bonner denied ever seeing the older child hurt Isaac.

{6} The State largely relied on circumstantial evidence to establish the identity of the abuser. The State's evidence demonstrated Defendant's access to Isaac during the estimated dates that the abuse occurred and ruled out other care givers as the abuser. There was testimony that Isaac appeared to be afraid of Defendant, and cried when left alone with Defendant. Bonner testified that she was present when Defendant told Isaac that he was sorry for hurting him and promised never to do it again. Defendant's counsel inadvertently elicited testimony from a social worker who stated that she had been

told by Bonner's daughter that "she had seen [Defendant] hit Isaac on his back and on his butt."

## DISCUSSION

### 1. Admission of Character Evidence

█ {7} Defendant argues that he was denied a fair trial as the result of the introduction of irrelevant and inflammatory character evidence.

{8} The State called Isaac's maternal grandmother, Phyllis Dinwiddie (Dinwiddie), as a witness. On cross-examination, defense counsel asked Dinwiddie whether she disliked Defendant "so it doesn't matter [to you] if he goes [to prison]?" Dinwiddie answered that she did not respect Defendant. Defense counsel then asked Dinwiddie whether "[y]our life would be simpler if he's not around, is that true ma'am?" Dinwiddie asked defense counsel if she could explain why she did not respect Defendant. Defense counsel directed Dinwiddie to "[j]ust answer my question." Dinwiddie conceded that "possibly" her life would be simpler if Defendant were not around.

{9} On redirect, the State asked Dinwiddie to explain why she lacked respect for Defendant. Dinwiddie began to explain:

> Well, there are many reasons the first reason is that he was a married man when he started pursuing my daughter 2½ years ago. Second reason was that when he knew that she was pregnant he disappeared for several months. The third reason was that he hauled her dog off and left it, the poor dog made its way home after seven days.

At this point, Defendant objected on the grounds that the State's question "called for a narrative response." The State responded that it had not opened this door. Defendant then moved to strike the comment about the dog. The trial court overruled Defendant's objection, and Dinwiddie continued:

> The fourth reason, he tore up [Bonner's] car and he drove it against my wishes, never checked it for oil, ... it was unfixable. He didn't work I offered to take him to a job one time. People called and said that he could go to work for them if he could get a ride down there (inaudible). I

went over to the trailer and said ["]you have a job, let me take you down there["] he would not go. He didn't want to work, he would work two weeks, three weeks on a job and then he would quit, lay around the house.

Defense counsel interrupted, stating that he wanted "to renew my objection." The trial court overruled Defendant's objection stating that "it rules the same." Dinwiddie continued:

> Well, ... my grandson was afraid of him, my granddaughter would not stay with him for the three months after he moved in, she would stay with me, so I knew something was wrong because she didn't want to live there. He could have stolen from me ... my mother caught him one time going through envelopes, the bank envelopes on my desk, let['s] see, what else, he has no regard or respect for anybody.

At this point, the trial court cut off Dinwiddie, stating "Alright [sic] ... I think we've got the reasons."

{10} Defendant concedes that "[w]here a defense attorney elicits evidence that a witness is biased against the defendant, the prosecutor unquestionably is entitled to rebut that evidence." However, Defendant argues that rebuttal is limited to evidence that shows that the witness is not biased, and that it is improper to rebut a claim of bias with evidence that merely explains the nature or extent of the witness' alleged bias. Defendant's "is so—is not" approach to rebuttal is too narrow. The effects of bias can run from subtle subconscious coloring of testimony to outright perjury. By suggesting to the jury that Dinwiddie would like to see Defendant go to prison, Defendant put Dinwiddie's state of mind toward Defendant in issue and thereby opened the door to the admission of evidence that would permit the jury to judge the extent to which Dinwiddie's desire to have Defendant out of her life might affect her ability to accurately and truthfully report events. *Cf. State v. Roberts*, 18 N.M. 480, 485, 138 P. 208, 209 (1914) (upholding admission of testimony showing "friendly relations" between defendant and alibi witnesses elicited by State on cross-examination of witnesses; observing that "[t]he purpose of

these questions was ... to discredit their testimony, and for such purpose was clearly admissible"). Dinwiddie's reasons for not respecting Defendant were helpful to the jury in evaluating the weight to be given her testimony and therefore met the relevancy standard of Rule 11–401 NMRA 2003. Further, under the principle of limited admissibility, Rule 11–105 NMRA 2003, evidence of Defendant's character and prior acts was admissible to rebut the inference of bias raised by Defendant's questioning of Dinwiddie about her negative feelings toward Defendant, even though this evidence may have been inadmissible for other purposes under Rule 11–404 NMRA 2003.

▆▆▆ {11} Defendant argues that even if Dinwiddie's reasons for not respecting Defendant were otherwise admissible, the trial court committed reversible error by not balancing the probative value of Dinwiddie's testimony against its potential for unfair prejudice to Defendant. *See* Rule 11–403 NMRA 2003. As noted above, the sole objection made by Defendant was that the State's question "calls for a narrative response."[1] The State argues that Defendant's objection failed to preserve a Rule 11–403 argument. Defendant, conceding that defense counsel "did not cite specific rules of evidence in making his objections," argues in his reply brief that defense counsel preserved the Rule 11–403 issue by asking for a mistrial on the following grounds:

> I move for a mistrial, your honor, on the grounds that she's brought all kinds of information that's prejudiced [Defendant] in this matter. She's been allowed to talk about things that occurred. And I believe that it's undue prejudice to the jury and would move for a mistrial.

{12} Rule 11–103(A)(1) NMRA 2003 provides that error may not be predicated upon a ruling admitting evidence in the absence of a *timely* and specific objection. "The purpose of requiring a timely objection is to identify the disputed issue and give the trial

judge a chance to correct errors which might otherwise necessitate a new trial." *Robinson v. Shapiro*, 646 F.2d 734, 742 (2d Cir.1981). By waiting until "the horse was already out of the barn," *State v. Neswood*, 2002–NMCA–081, ¶ 18, 132 N.M. 505, 51 P.3d 1159, Defendant frustrated the purpose of Rule 11–103(A)(1). We hold that Defendant's motion for a mistrial, to the extent that it could be construed as invoking Rule 11–403 balancing, was untimely. *Id.* Accordingly, Defendant's claim of error under Rule 11–403 may not be considered on appeal unless it amounts to plain error or fundamental error. *State v. Barraza*, 110 N.M. 45, 49, 791 P.2d 799, 803 (Ct.App.1990).

▆▆▆ {13} We summarily reject the applicability of fundamental error. Fundamental error occurs "only where the defendant's guilt is open to such question as would shock the conscience if the conviction were permitted to stand." *State v. Jett*, 111 N.M. 309, 314, 805 P.2d 78, 83 (1991). There was overwhelming evidence that Isaac had been intentionally abused. Although the State's case identifying Defendant as the perpetrator of the abuse was circumstantial, it nevertheless was compelling. Further, Defendant concedes in his briefs in this Court that the jury could have found Defendant guilty of unintentional abuse in view of evidence that Defendant had ignored Isaac's condition for several days, by which time Isaac was having difficulty breathing and had become severely dehydrated. We are satisfied that the jury's verdict is not a miscarriage of justice.

▆▆▆ {14} Plain error is broader than fundamental error. *State v. Lucero*, 116 N.M. 450, 453, 863 P.2d 1071, 1074 (1993). Plain error is not limited to situations in which an error results in the conviction of a defendant who is innocent of the crime for which he has been convicted. *Id.* Application of the plain error doctrine by an appellate court constitutes an "exercise of remedial discretion." *United States v. Olano*, 507 U.S. 725, 736, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993). We

---

1. There is no per se rule against narrative testimony. *See* Rule 11–611(A) NMRA 2003; 28 Charles Alan Wright & Victor James Gold, Federal Practice and Procedure § 6164 (2003). Defendant has not briefed the issue of whether the trial court abused its discretion under Rule 11–611(A) in allowing Dinwiddie to give a narrative answer. We therefore deem any Rule 11–611(A) objection as to the form of the State's question to have been abandoned.

decline to address the issue of plain error because it has not been briefed by Defendant. *See State v. Romero,* 119 N.M. 195, 196, 889 P.2d 230, 231 (Ct.App.1994).

## 2. The Trial Court Acted Properly in Amending the Judgment and Sentence

{15} The trial court sentenced Defendant on August 29, 2001, immediately after the jury returned its verdict. The trial court imposed the basic, mandatory eighteen-year term of imprisonment prescribed for child abuse resulting in great bodily harm. *See* § 30–6–1(D) (designating child abuse resulting in great bodily harm as first degree felony); NMSA 1978, § 31–18–15(A)(1) (1999) (establishing eighteen-years imprisonment as basic sentence for a first degree felony). After hearing argument from defense counsel, the trial court declined to alter the basic sentence of eighteen-years imprisonment.

{16} The State then pointed out that pursuant to Section 31–18–15(F), the trial court was required to indicate whether or not Defendant had been convicted of a "serious violent offense." The State referred the trial court to NMSA 1978, § 33–2–34(L)(4) (1999) which lists the offenses that constitute a serious violent offense. The trial court expressed its concern with the fact that the jury instructions included two theories of child abuse and that in view of the general verdict, the trial court could not rule out the possibility that the jury had found Defendant guilty of non-intentional child abuse. The State argued that under either theory presented to the jury, Defendant's offense could be designated a serious violent offense. Defendant argued that the trial court could not tell from the general verdict which theory of child abuse the jury had accepted, and that, therefore, it would be improper to find that Defendant had been convicted of a serious violent offense. The trial court orally sentenced Defendant to eighteen-years imprisonment, followed by two years parole. The trial court rejected the State's request for a determination that Defendant had committed a serious violent offense. The trial court ordered that Defendant be immediately taken into custody.

{17} On August 31, 2001, the trial court entered a written Judgment, Sentence and Commitment. The Judgment recited that Defendant was guilty of one count of child abuse involving great bodily harm, sentenced Defendant to eighteen-years imprisonment to be followed by two years of parole and ordered that Defendant be transferred from the Grant County Detention Center to the Department of Corrections facility in Los Lunas, New Mexico. The Judgment did not indicate whether or not Defendant had committed a serious violent offense. On September 4, 2001, the trial court entered a Commitment to Penitentiary ordering the Sheriff of Grant County to deliver Defendant to the custody of the Department of Corrections.

{18} On September 5, 2001, the trial court, acting sua sponte, entered an Order upon Reconsideration on Terms of Judgment and Sentence. The Order provided as follows:

THIS MATTER came before the Court sua sponte following the Court's pronouncement of sentence upon the Defendant wherein the Court declined to certify the crime for which Defendant was convicted as a "serious violent offense" pursuant to NMSA 1978, Section 33–2–34(L)(4)(n) (1999).

1. The Court declined certification from the bench upon sentencing Defendant to eighteen (18) years in the custody of the New Mexico Department Of Corrections with a two (2) year parole upon release, reasoning that the jury instructions provide an alternative basis for conviction of negligent commission of child abuse resulting in great bodily harm and there was no way to tell whether the jury verdict was based on an intentional act or a negligent act and the latter would not suffice as a violent act.

2. Upon further reflection and considering the medical testimony about the amount of force required to inflict the injuries suffered by the infant victim to his ribs, the Court finds that the force required to cause the injuries even if negligently done would necessarily be by a serious violent act of the Defendant.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that the Court's prior failure to certify the crime for which Defendant was convicted as a "serious violent offense" is reversed and the crime is hereby certified a "serious violent felony" for purposes of NMSA 1978, Section 33–2–34(L)(4)(n)(1999).

IT IS FURTHER ORDERED that the District Attorney draft an Amended Judgment, Sentence & Commitment to include the finding set out in paragraph 2 above.

On October 1, 2001, the trial court entered a First Amended Judgment, Sentence and Commitment certifying Defendant as having committed a serious violent offense.

{19} Defendant argues that the trial court exceeded its jurisdiction by amending the original judgment to include a finding addressing the question of whether his conviction was for a serious violent offense. We disagree for the reasons set out below.

{20} Section 31–18–15(F) provides that "[w]hen the court imposes a sentence of imprisonment for a felony offense, the court *shall* indicate *whether or not* the offense is a serious violent offense." (Emphasis added.) The original judgment did not indicate "whether or not" Defendant had committed a serious violent offense; it was completely silent on this issue. In our view, the omission of any finding does not satisfy the statutory requirement of an affirmative finding as to whether *or not* Defendant committed a serious violent offense. Where a sentence lacks a statutorily-mandated provision, the trial court retains jurisdiction to correct the sentence by adding the omitted term. *State v. Aragon,* 109 N.M. 632, 638, 788 P.2d 932, 938 (Ct.App.1990).

{21} Defendant argues that he had a reasonable expectation of finality in the original judgment and sentence and that the trial court impermissibly subjected him to double jeopardy when it entered an amended judgment and sentence designating his offense as a serious violent offense. *See State v. Cheadle,* 106 N.M. 391, 393, 744 P.2d 166, 168 (1987). Again, we disagree with Defendant.

{22} Under the New Mexico Constitution, the State has a constitutional right to appeal from a disposition contrary to law. *State v. Santillanes,* 96 N.M. 482, 485–86, 632 P.2d 359, 362–63 (Ct.App.1980), *aff'd in part and rev'd in part on other grounds,* 96 N.M. 477, 632 P.2d 354 (1981). A judgment and sentence that improperly omits a determination that the defendant was convicted of a serious violent offense has the potential to dramatically and unlawfully reduce the amount of actual imprisonment to which a defendant will be subjected by allowing the defendant to accrue meritorious deductions not contemplated by the legislature. *Compare* § 33–2–34(A)(1) (authorizing maximum of four days per month meritorious deductions in case for defendant convicted of serious violent offense), *with* § 33–2–34(A)(2) (authorizing up to thirty days per month meritorious deductions for defendant convicted of nonviolent offense). Had the trial court allowed the original judgment to stand, the State would have had thirty days from August 31, 2001, within which to appeal. Rule 12–201(A)(2) NMRA 2003.

{23} In *United States v. DiFrancesco,* 449 U.S. 117, 139, 101 S.Ct. 426, 66 L.Ed.2d 328 (1980), the United States Supreme Court held that a defendant has no reasonable expectation of finality in his judgment and sentence until the expiration of the time within which the government may file an appeal. In *Cheadle,* our Supreme Court acknowledged the *DiFrancesco* exception to the traditional rule that a defendant has a reasonable expectation of finality in his or her sentence once the defendant has begun serving the sentence. *Cheadle,* 106 N.M. at 394, 744 P.2d at 169 (distinguishing *DiFrancesco* on factual grounds). In *Cheadle,* the Supreme Court emphasized the fact that the judgment and sentence at issue was "not contrary to law." *Id.* at 392, 744 P.2d at 167. In contrast to the sentence at issue in *Cheadle,* Defendant's sentence was contrary to law in that it omitted the finding required by Section 31–18–15(F). Here, the trial court vacated Defendant's original judgment and sentence within the period during which the State could have exercised its constitutional right to appeal. Under *DiFrancesco,* Defendant had no reasonable expectation of finality because the time within which the State

could appeal had not expired as of the date that the trial court vacated the original sentence.

{24} Defendant argues that the trial court abused its discretion by finding that he committed a serious violent offense. Defendant's argument is based on the fact that the jury was instructed on two theories of abuse (1) *intentionally causing* Isaac to be placed in a situation that endangered his life or health, and (2) *negligently permitting* Isaac to be placed in a situation that endangered his life or health. Defendant points out that we have construed Subsection 33–2–34(L)(4)(n) to require a finding that the defendant committed the crime "in a physically violent manner." *State v. Morales,* 2002–NMCA–016, ¶ 16, 131 N.M. 530, 39 P.3d 747. According to Defendant, the second alternative presented to the jury was legally insufficient under *Morales.* Defendant reasons that, in view of the general verdict form on the abuse count, it is possible that the jury actually acquitted Defendant of *intentionally causing* Isaac's injuries and instead convicted him of *negligently permitting* Isaac to be abused, either by allowing others to harm Isaac or, regardless of who injured Isaac, by ignoring Isaac's injuries and allowing Isaac to lapse into a state of life-threatening dehydration. Defendant argues that the trial court abused its discretion by construing the ambiguous jury verdict against Defendant.

{25} It is settled that the prohibition against double jeopardy has a collateral estoppel aspect. *See Schiro v. Farley,* 510 U.S. 222, 232–36, 114 S.Ct. 783, 127 L.Ed.2d 47 (1994) (discussing burden of proof in establishing factual predicate for application of "constitutional collateral estoppel"). In *Schiro* the United States Supreme Court acknowledged the possibility that a state might be precluded by constitutional collateral estoppel from using as a sentencing factor a circumstance that had been determined adversely to the state in the guilt phase of the trial. Like the present case, *Schiro* involved an ambiguous verdict. *Schiro* held that the defendant bears the burden of proving that the issue he claims was foreclosed by the jury verdict was actually decided adversely to the state. *See also Dowling v. United States,* 493 U.S. 342, 350–51, 110 S.Ct. 668, 107 L.Ed.2d 708 (1990) (collecting cases from federal Courts of Appeals).

{26} Our examination of the record satisfies us that a rational jury could have found that Defendant intentionally caused Isaac's injuries. Indeed, Defendant has not argued on appeal that the State failed to come forward with substantial evidence that Defendant intentionally caused Isaac's injuries. Further, we are unable to discern from the record a basis for inferring that the jury acquitted Defendant of intentional abuse. Thus, Defendant, who bears the burden of proof, has failed to establish the factual predicate for application of collateral estoppel, namely, that the issue of ultimate fact was determined in his favor by the jury. *Schiro,* 510 U.S. at 232, 114 S.Ct. 783. Accordingly, the trial court was not required to resolve the general verdict in Defendant's favor. *See id.*

{27} In addition to the substantive errors asserted in this opinion, Defendant argues that the trial court deprived him of procedural due process and his right to allocution when it reconsidered its original sentence without affording Defendant advance notice and an opportunity to be heard. The order vacating the original judgment was entered on September 5, 2001; it was not until October 1, 2001, that an amended order was entered. Defendant did not file a motion seeking reconsideration of the order vacating the original judgment, nor did he file a motion challenging the legality of the manner in which the amended sentence was imposed. *See* Rule 5–801(A) NMRA 2003. As a consequence, we have no record upon which to evaluate the merits of Defendant's claims of procedural error in the imposition of the amended sentence, or to determine whether the State may have a defense to these claims such as waiver or harmless error. We conclude that the appropriate course is dismissal without prejudice of Defendant's claims relating to the manner in which his amended sentence was imposed so that Defendant may avail himself of the remedy provided by Rule 5–801.

## CONCLUSION

{28} We affirm the amended Judgment and Sentence imposed by the trial court, subject to Defendant's right to seek relief under Rule 5–801.

{29} **IT IS SO ORDERED.**

WE CONCUR: JONATHAN B. SUTIN and CYNTHIA A. FRY, Judges.